## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

MAKINA VE KIMYA ENDUSTRISI A.S, :

                           Plaintiff, :

                  -against- :

A.S.A.P. LOGISTICS LTD, ASAP LOGISTICS :
AND DEFENSE SECURITY SERVICES LTD., :
ASAP LOJISTIK VE SAVUNMA TICARET :
LIMITED SIRKETI D/B/A ASAP LOGISTICS :   Case No. 1:22-cv-03933 (PGG)
AND DEFENSE AND/OR ASAP LOGISTICS AND :
DEFENSE GUVENLIK HIZMETLERI SANAYI :
VE TICARET LIMITED SIRKETI, TURKKEY :
CAPITAL KURUMSAL FINANS COZUMLERI :
LIMITED SIRKETI D/B/A TURKKEY CAPITAL :
KURUMSAL FINANS COZUMLERI LIMITED :
SIRKETI; DEBORAH CROSS, GÜVEN ACARER, :
METIN NERKIS, TÜRKER KÜÇÜKER & İLKER :
KÜÇÜKER, :

                  Defendants.

------------------------------------------------------------- X

## ASAP DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF PAMELA O'NEILL UNDER FED. R. EVID. 702 AND 703

### PUBLICLY FILED WITH REDACTIONS

### <u>ORAL ARGUMENT REQUESTED</u>

COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, New York 10036
(212) 790-9200

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 1

I.     LEGAL STANDARD ......................................................................................... 1

II.    MS. O'NEILL'S REASONABLE  CALCULATION AND TESTIMONY
SHOULD BE EXCLUDED ............................................................................... 12

     A.    Ms. O'Neill's Reasonable Royalty Testimony is Irrelevant Because the Theory
is Unavailable in Trademark Cases with No Licensing History .............................. 3

     B.    Ms. O'Neill's Use of Unconsummated Offers and Third-Party Transactions
to Calculate a Royalty Base and Royalty Rate is Unreliable and Irrelevant ........... 4

           1.    Royalty Base .............................................................................................. 4

           2.    Royalty Rate ............................................................................................... 7

III.   MS. O'NEILL'S CORRECTIVE ADERTISING CALCULATION AND
TESTIMONY SHOULD BE EXCLUDED ........................................................ 12

     A.    Ms. O'Neill's Testimony That Corrective Advertising Damages Are
Warranted Is Not Based on Sufficient Facts or Data ............................................. 12

     B.    Ms. O'Neill's Opinion That Compensable Corrective Advertising
Took Place Is Not Based on Sufficient Facts or Data ............................................ 12

IV.   MS. O'NEILL'S LOST PROFITS CALCULATION AND TESTIMONY
SHOULD BE EXCLUDED ............................................................................... 17

CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ................................................................8

*The Apollo Theater Found., Inc. v. W. Int'l Syndication*,
2005 WL 1041141 (S.D.N.Y. May 5, 2005) ...........................................7

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
222 F. Supp. 2d 423 (S.D.N.Y. 2002), *aff'd sub nom.*, *In re Omeprazole
Patent Lit.*, 84 F. App'x 76 (Fed. Cir. 2003) ...............................2, 3, 8

*Au New Haven v. Ykk Corp.*,
2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) .......................................10

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*,
750 F.2d 903 (Fed. Cir. 1984) ................................................................7

*Capri Sun GmbH v. Am. Bev. Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022) .......................................................2

*Colon v. BIC USA, Inc.*,
199 F. Supp. 2d 53 (S.D.N.Y. 2001) .......................................................1

*Cornell Univ. v. Hewlett-Packard Co.*,
2008 WL 2222189 (N.D.N.Y. May 27, 2008) .........................................4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ..............................................................................1, 2

*E. Mishan & Sons, Inc. v. Novel Brands LLC*,
2020 WL 9815178 (S.D.N.Y. Feb. 13, 2020) ........................................14

*EEOC v. Bloomberg L.P.*,
2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ...........................14, 15, 19

*Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co.*,
647 F. Supp. 3d 145 (S.D.N.Y. 2022) .....................................................4

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ............................................................................3, 20

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970), *aff'd*, 446 F.2d 295 (2d Cir. 1971) ................................3

ii

*ICM Controls Corp. v. Honeywell Int'l, Inc.*,
2021 WL 3403734 (N.D.N.Y. Aug. 4, 2021) ...................................................8, 9

*Island Intellectual Prop. LLC v. Deutsche Bank AG*,
2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) ...........................................................19

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
2006 WL 1359955 (S.D.N.Y. May 18, 2006) ...................................................4, 14

*Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*,
2023 WL 6214909 (S.D.N.Y. Sept. 25, 2023)........................................................12

*LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016).........................................................2, 3, 13

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ....................................................................19

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2d Cir. 2013).............................................................................18, 19

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) .............................2

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997)........................................................................8, 16, 17

*Rowe Entertainment, Inc. v. William Morris Agency, Inc.*,
2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)..............................................15, 19

*Speedfit LLC v. Woodway USA, Inc.*,
2019 WL 1436306 (E.D.N.Y. Mar. 29, 2019) ..................................................5, 11

*Streamline Prod. Sys. v. Streamline Mfg.*,
851 F.3d 440 (5th Cir. 2017) .................................................................................6

*W.W.W. Pharm. Co. v. Gillette Co.*,
808 F. Supp. 1013 (S.D.N.Y. 1992)......................................................................12

*Wills v. Amerada Hess Corp.*,
379 F.3d 32 (2d Cir. 2004)......................................................................................2

*Zaremba v. Gen. Motors Corp.*,
360 F.3d 355 (2d Cir. 2004).................................................................................13

**Other Authorities**

Fed. R. Evid. 702 ....................................................................................................1, 8

Fed. R. Evid. 703 ............................................................................................................18, 19

R. Weil, M. Wagner & P. Frank, *Litigation Services Handbook: The Role of a Financial Expert*, Ch. 21.............................................................................................................3

Defendants A.S.A.P. Logistics Ltd. ("ASAP Logistics"), ASAP Logistics and Defense Security Services Ltd. ("ASAP Security"), ASAP Lojistik Ve Savunma Ticaret Limited Sirketi ("ASAP Turkey") and Debbie Cross (collectively, "ASAP Defendants") move to exclude the expert report of Pamela O'Neill (the "O'Neill Report"), submitted on behalf of Plaintiff Makina Ve Kimya Endustrisi A.S. ("MKE"), as well as any expert testimony about the O'Neill Report.

## PRELIMINARY STATEMENT

In this trademark infringement action in which the ASAP Defendants never made a single sale of MKE products or generated any revenue from use of the MKE mark, MKE's damages expert, Pamela O'Neill, has nevertheless opined that MKE somehow suffered millions of dollars in damages.  She offers three alternative bases of calculating MKE's alleged damages: $11.175 million for a reasonable royalty, $7.4 to $8.1 million for corrective advertising costs, or a "floor calculation" of $4.34 million for lost profits from a single customer.  However, as detailed below, each of her theories is so farfetched and speculative that her report and opinions should be excluded in their entirely.  At odds with both the governing law and the applicable factual record, and based on insufficient or irrelevant data consisting largely of her client's biased but unsupported assertions, Ms. O'Neill's theories epitomize the kind of unreliable evidence that *Daubert* and Fed. R. Evid. 702 are designed to exclude.

## ARGUMENT

### I.    LEGAL STANDARD

Admissibility of expert testimony is governed by Fed. R. Evid. 702, which has been amended to incorporate the principles enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 69 (S.D.N.Y. 2001).  Under Rule 702, once a witness qualifies as an expert, the party seeking to admit expert

testimony bears the burden to show that (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; (3) the expert has reliably applied the principles and methods to the facts of the case; and (4) the testimony is relevant and will assist the jury. *See*, *e.g.*, *Capri Sun GmbH v. Am. Bev. Corp.*, 595 F. Supp. 3d 83, 119 (S.D.N.Y. 2022); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 239-40 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

Trial courts serve as "gatekeep[ers]," responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). "The Court's task 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635-36 (S.D.N.Y. 2016) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1991)). "The Second Circuit instructs district courts to exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Id*. at 636 (internal quotation marks omitted).

"To be admissible, expert testimony must be … both reliable and relevant in that it 'fits' the facts of the case." *Id*. at 641 (citing *Daubert*, 509 U.S. at 591-92). Under the "fit" or relevance requirement enunciated in *Daubert*, "even if the methodology used by the expert is considered to be reliable, the expert's testimony will nevertheless fail to meet the 'fit' requirement and should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002), *aff'd sub nom.*, *In re Omeprazole Patent Lit.*, 84 F. App'x

2

76 (Fed. Cir. 2003). "If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value." *Id.* (citing *Lightfoot v. Union Carbide Corp.*, 1999 U.S. App. LEXIS 3329, at *7 (2d Cir. Mar., 1, 1999)). Finally, the Court must reject expert testimony where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also LVL XII Brands*, 209 F. Supp. 3d at 641.

As detailed below, Ms. O'Neill's opinions on MKE's alleged damages fail to meet the required standards of reliability and relevance for expert testimony and should be excluded.

## II.   MS. O'NEILL'S REASONABLE ROYALTY CALCULATION AND TESTIMONY SHOULD BE EXCLUDED

### A.   Ms. O'Neill's Reasonable Royalty Testimony is Irrelevant Because the Theory is Unavailable in Trademark Cases with No Licensing History

As a threshold matter, Ms. O'Neill's reasonable royalty theory does not fit the facts of this case because it is based on the mistaken legal assumption that the *Georgia-Pacific* reasonable royalty patent analysis (*see Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *aff'd*, 446 F.2d 295 (2d Cir. 1971)) is generally applicable to trademark cases. The O'Neill Report states: "Although Georgia-Pacific is a patent case, I understand that the Southern District of New York (and other jurisdictions) has held that these same factors are appropriate for determining an appropriate reasonable royalty in Lanham Act cases, as well." O'Neill Report (Berman Ex. 1) at 15.

However, as the Litigation Services Handbook cited by Ms. O'Neill states, "Lanham Act case law has no equivalent to the *Georgia-Pacific* case" and "there simply appears to be no established legal precedent for" applying the *Georgia-Pacific* framework to trademark cases. R. Weil, M. Wagner & P. Frank, *Litigation Services Handbook: The Role of a Financial Expert*,

Ch. 21 (Berman Ex. 8) at 21-16.  Moreover, as detailed in the ASAP Defendants' accompanying

summary judgment motion, the sole New York case cited by Ms. O'Neill to support her

understanding, *Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145 (S.D.N.Y.

2022), actually rejected imposition of a reasonable royalty to the only pure trademark claim in

the case, limiting application of the theory to a combined patent-trade dress award.  *Id*. at 256,

258.  The Court's opinion made clear that the reasonable royalty remedy in trademark cases was

atypical, generally being confined to where the parties had an actual or contemplated license

agreement.  *Id*. at 258.

As in *Focus Prods.*, there was no actual or contemplated license agreement here.  O'Neill

Dep. (Berman Ex. 2) at 69:2-6.  Indeed, there is no history of MKE licensing its trademark at all.

*Id*. at 96:22-97:8, 97:24-98:16.  Under such circumstances, there is no basis for a reasonable

royalty award, and expert testimony calculating such an award is properly precluded.  *See Juicy

Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006)

(precluding expert testimony on reasonable royalty where plaintiff had no prior licensing

arrangement with defendant or any cosmetics manufacturer).  The Court should do so here.

### B.    Ms. O'Neill's Use of Unconsummated Offers and Third-Party Transactions to Calculate a Royalty Base and Royalty Rate is Unreliable and Irrelevant

Even if it were somehow proper to award a trademark reasonable royalty absent any prior

licensing history, Ms. O'Neill's calculations of both the royalty base and royalty rate are mired

in unfounded speculation, insufficient facts and data and erroneous assumptions.  Accordingly,

her reasonable royalty opinion should be excluded on that basis as well.

### 1.    Royalty Base

In calculating a reasonable royalty, the royalty base consists of "the product sales which

would be subject to a reasonable royalty."  *See*, *e.g.*, *Cornell Univ. v. Hewlett-Packard Co.*, 2008

WL 2222189, at *1 (N.D.N.Y. May 27, 2008).  Here, there are no such sales because the ASAP

Defendants never consummated any transactions.  O'Neill Dep. (Berman Ex. 2) at 48:19-50:16,

74:15-20, 106:4-12, 108:23-109:8.  As a result, Ms. O'Neill applied the royalty to hypothetical

revenues that potentially could have been generated from two transactions in which the ASAP

Defendants made offers involving MKE ammunition to potential purchasers, M42 Tactical and

TD Group.  O'Neill Report (Berman Ex. 1) ¶ 48.  The ASAP Defendants are aware of no case

support for awarding a reasonable royalty based on sales that never occurred, and Ms. O'Neill's

calculation should be excluded on that basis alone.  As set forth in the ASAP Defendants'

summary judgment motion, such a calculation improperly imposes a penalty by divorcing the

recovery from any marketplace reality.  *See* ASAP SJ Brief at 11-14.

     Untroubled by such concerns, Ms. O'Neill insisted that it was irrelevant whether MKE

would ever have been able to consummate transactions with the purchasers on the terms of

ASAP Turkey's offers.  O'Neill Dep. (Berman Ex. 2) at 83:11-85:21, 87:12-88:25.  Thus, Ms.

O'Neill simply ignored critical record evidence strongly suggesting that such deals would never

have been made either by MKE or the potential purchasers.  Such an approach runs directly

counter to how a reasonable royalty is supposed to be calculated.  *See*, *e.g.*, *Speedfit LLC v.*

*Woodway USA, Inc.*, 2019 WL 1436306, at *8 (E.D.N.Y. Mar. 29, 2019) (excluding reasonable

royalty testimony where expert "concluded with little explanation that the parties would have

agreed to the reasonable royalty rate") (quoting *Exmark Mfg. Co. v. Briggs & Stratton Power*

*Prods. Grp, LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018)).

     Had Ms. O'Neill analyzed the actual prospects of her hypothetical transactions ever being

completed, she would have been forced to confront a central premise of MKE's lawsuit: that it

considered the ASAP offers to be too low.  *See*, *e.g.*, First Amended Complaint (ECF No. 59) ¶¶

88-91.  Instead, Ms. O'Neill never asked MKE whether it would have accepted ammunition deals at ASAP Turkey's reduced prices.  O'Neill Dep. (Berman Ex. 2) at 99:3-25.  She likewise ignored readily available evidence that was directly probative of the likelihood that MKE and M42 Tactical would not ever have reached any agreement: the fact that their direct discussions following the removal of the ASAP Defendants failed to result in any agreement.  Safak Dep. (Berman Ex. 3) at 27:3-29:13; O'Neill Dep. (Berman Ex. 2) at 143:22-148:25. Ms. O'Neill acknowledged that "there could be a lot of reasons" why MKE and M42 Tactical failed to complete a deal, including because they couldn't agree on the terms of a contract, but she never asked MKE about those negotiations and thus remained ignorant as to why they were unable to do business.  O'Neill Dep. (Berman Ex. 2) at 145:22-146:19.

Ms. O'Neill displayed a similar lack of interest in marketplace realities with respect to TD Group.  She pulled a $216 million figure from a draft sales contract with ASAP Turkey to use as the royalty base for that transaction.  O'Neill Report (Berman Ex. 1) ¶ 49, Ex. C-10; Berman Ex. 9.  However, later drafts reflecting TD Group's edits gave it complete discretion to buy as little ammunition as it wanted with no minimum requirement.  O'Neill Dep. (Berman Ex. 2) at 107:25-112:14, 113:8-115:19, 117:24-120:11; Berman Exs. 10, 11.  Ms. O'Neill disregarded this evidence, simply selecting the maximum possible value of the contract without considering whether TD Group would ever have purchased such large quantities or whether MKE would ever have signed a deal without any required minimum guarantee.  O'Neill Dep. (Berman Ex. 2) at 110:18-113:3, 119:10-120:11.  Although Ms. O'Neill insisted that "[t]his is what goes on when you use a reasonable-royalty method to calculate damages" (O'Neill Dep. (Berman Ex. 2) at 120:4-11), the case law does not reflect such an unrestrained approach to reasonable royalty analysis.  *See*, *e.g.*, *Streamline Prod. Sys. v. Streamline Mfg.*, 851 F.3d 440,

460 (5th Cir. 2017) ("any royalty-based measures of damages must exhibit a strictly rational correlation between the rights appropriated and the measure of damages applied"); *Bandaq, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 920 (Fed. Cir. 1984) (same).

Ms. O'Neill also claimed that it was irrelevant whether MKE had sufficient capacity to supply the buyers with the large quantities of ammunition involved. O'Neill Dep. (Berman Ex. 2) at 100:17-104:7, 106:13-107:24. She thus ignored evidence showing MKE's production lines were "entirely full" at the time. Gonenli Dep. (Berman Ex. 4) at 51:22-52:9, 53:4-54:16; *see also* Safak Dep. (Berman Ex. 3) at 56:9-58:12; Quirino Dep. (Berman Ex. 5) at 90:21-91:16. She claimed it was simply a matter of shifting MKE's priorities (something it had not done for its own U.S. distributor), and that MKE was entitled to the reasonable royalty regardless because its trademark had been usurped. O'Neill Dep. (Berman Ex. 2) at 101:2-104:7.

However, once again, Ms. O'Neill could simply have consulted the Litigation Services Handbook on which she relied to see that "[a] finding of trademark infringement will not necessarily result in a monetary award…." R. Weil, M. Wagner & P. Frank, *supra*, at 21-11 to 21-12. Because Ms. O'Neill's decision to use the M42 Tactical and TD Group negotiations to create a royalty base is based on mistaken assumptions as to the principles supporting a reasonable royalty, and relies on insufficient data and facts at odds with the actual record evidence, her reasonable royalty opinion should be excluded.

## 2.    Royalty Rate

Ms. O'Neill's selected royalty rate of 5% should also be excluded because it is based on transactions that are not comparable to the present case. Because reasonable royalty awards in trademark are "seldom-used," *see The Apollo Theater Found., Inc. v. W. Int'l Syndication*, 2005 WL 1041141, at *13 (S.D.N.Y. May 5, 2005), the principles for what makes a sufficient

comparable must be borrowed from patent law.  There, "alleging a loose or vague comparability between different technologies or licenses does not suffice."  *ICM Controls Corp. v. Honeywell Int'l, Inc.*, 2021 WL 3403734, at *5 (N.D.N.Y. Aug. 4, 2021) (quoting *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012)).  "Even if the technology relates to the same general field of technology, the damages expert must prove a relationship to the patented technology or the accused infringing products."  *Id.* (citing *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-71 (Fed. Cir. 2010)).  Courts will even reject comparables that involve an actual party to the case and the same type of products that are at issue, if the comparables involve a separate patent.  *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971-972 (Fed. Cir. 2022) (excluding testimony about licenses, even though they involved defendant and covered the same type of products, because they involved different patents from those at issue); *ICM Controls Corp.* 2021 WL 3403734, at *5-6, 18-21 (same).

"When an expert opinion relies on a license agreement that is not sufficiently comparable, that opinion is unreliable under Rule 702 and should be excluded."  *Id.* at *19 (excluding portion of report discussing incomparable license); *see also Astra Aktiebolag*, 222 F. Supp. 2d at 488 ("expert's testimony … should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case") (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997)).  Such is the case here.

Ms. O'Neill selected six purportedly comparable transactions identified by searching a database of intangible property licenses.  O'Neill Dep. (Berman Ex. 2) at 127:24-129:2, 130:12-131:12.  She did no independent analysis of the comparability of the transactions beyond eliminating duplicates, mislabeled transactions and entries devoid of data.  *Id*. at 131:13-132:5.  She made no attempt to locate the publicly available underlying agreements so that she could

probe the particulars of the transactions.  *Id*. at 130:3-6.  As detailed below, any meaningful review of the transactions would have revealed numerous distinctions from the present case making them poor candidates to use as comparables:

Richard J. Casull-Casull Corporation.  The description of this transaction notes that the licensee "holds a license agreement for the rights of most of the present and future *patents* of Richard J. Casull."  O'Neill Report (Berman Ex. 1) at Ex. C-1 (transaction 3) (emphasis added).  Thus, it is likely that the license involved patents, not trademarks.  Ms. O'Neill conceded that there could be meaningful economic differences between patent and trademark licenses, but made no effort to determine whether the six licenses she relied upon even involved trademarks.  O'Neill Dep. (Berman Ex. 2) at 132:20-134:9. If courts preclude a comparable with the same party and the same product because it involves a different patent, certainly a license involving unrelated parties and a different form of intellectual property must be precluded.  *See ICM Controls Corp.*, 2021 WL 3403734, at *5.  Ms. O'Neill also testified that the Casull transaction might involve related parties, and that it would be preferable to use transactions in which the parties were not related.  O'Neill Dep. (Berman Ex. 2) at 134:10-135:2.

Tactical Operational Support Services-Lamperd Less Lethal.  A publicly available copy of what appears to be the applicable agreement lists the territory as Puerto Rico and the Dominican Republic.  O'Neill Dep. (Berman Ex. 2) at 154:12-158:21; Berman Ex. 12.  Ms. O'Neill did not focus on whether her transactions were limited to the U.S., even though her damage calculation purports to measure harm to MKE in the U.S. market.  O'Neill Dep. (Berman Ex. 2) at 122:12-123:20, 132:6-19, 228:5-13.  Because the transaction involved a sales commission agreement with a commission payment percentage that is very different from the royalty rates of the other five transactions, Ms. O'Neill claimed she did not give it much weight

9

in her calculation.  O'Neill Dep. (Berman Ex. 2) at 160:18-161:22.    However, her report

provides no such indication, and does not offer any explanation of how each transaction factored

into her final selected 5% rate.

Remington Arms Co., Inc.-Pure Fishing, Inc.  This transaction covers "fish tackle other

than fishing rod and reel combinations" and "fishing rod and reel combinations."  O'Neill Report

(Berman Ex. 1) at Ex. C-1 (transaction 2).  It is not apparent why fishing equipment would be a

suitable substitute for ammunition in calculating a relevant royalty rate.  A review of the publicly

available asset purchase agreement also shows that the royalty rate is part of a right of first offer

provision.  There is no evidence as to whether a license agreement was ever formed pursuant to

that provision.  O'Neill Dep. (Berman Ex. 2) at 153:3-23; Berman Ex. 13.

AMMO, Inc. Agreements with Jeff Rann and Jesse James Firearms Unltd, LLC.  These

two transactions involved celebrity endorsement agreements in which the royalty was paid for a

host of services offered by the celebrity licensor.  Celebrity endorsement deals are a different

kind of transaction than would be involved in a license of the MKE trademark.  O'Neill Dep.

(Berman Ex. 2) at 164:25-169:13, 171:18-174:13; Berman Exs. 14, 15.

Smith & Wesson Inc.-AOB Products Company.  The description for this transaction does

not list "ammunition" among the specific products.  O'Neill Report (Berman Ex. 1) at Ex. C-1

(transaction 1).  It is also unclear what intellectual property is being licensed.  *Id.*

Beyond the significant distinctions addressed above, the six selected transactions cover a

span of more than twenty years, further reducing their suitability as comparables.  The earliest

agreement dates back to 1996, and even the most recent one from July 2020 is about a year

before any of the activities at issue here.  The differing time frames further contribute to the

speculative nature of Ms. O'Neill's conclusions.  *See Au New Haven v. Ykk Corp.*, 2019 WL

1254763, at *27 n. 117 (S.D.N.Y. Mar. 19, 2019) (licenses relied on to support reasonable royalty "must be proven to be sufficiently comparable to the hypothetical license at issue with respect to … time period") (quoting *Ravo v. Covidien LP*, 55 F. Supp. 3d 766, 775 (W.D. Pa. 2014) (citing *Apple v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014)).

Finally, even if the six license agreements were considered comparable, Ms. O'Neill has not explained how she derived her 5% royalty rate from the range of numbers covered by the other transactions.  It is not enough for an expert to pick comparables with varying rates and simply chose the median one to apply.  An expert must explain *why* the rate she chooses matches the facts of the case more than other rates she has identified.  This was the precise situation in *Speedfit*, 2019 WL 1436306, where the Court precluded an expert from using an 8% royalty rate that it deemed he arrived at "as if 'plucked' out of thin air." *Id*. at *8 (precluding expert from testifying to 8% reasonable royalty figure where expert testified it was "more or less in the middle" of rates calculated and "[a]t the end of the day it's a judgment").

Ms. O'Neill has similarly plucked a 5% rate out of thin air, noting only that it appeared in several transactions and was also the median of those reviewed.  O'Neill Report (Berman Ex. 1) ¶ 37.  No effort was made to explain why the comparables with a 5% rate were more apt than those with lower or higher rates or were more likely to be agreed to by the parties than any other rate.  Nor does Ms. O'Neill's "qualitative analysis," which similarly calculates a range of possible rates, provide any better explanation for the chosen rate. *Id*. ¶ 41.  To the extent that analysis relies on MKE's alleged greater profitability and sales growth in comparison to other companies in the industry, its utility is undermined by Ms. O'Neill's reliance on MKE's performance on a global level, not in the U.S. market ███████████████████████████████

███████████████.  O'Neill Dep. (Berman Ex. 2) at 137:13-138:24, 257:7-19.

11

Because the six transactions relied on are not sufficiently comparable to the present case, and the 5% royalty rate allegedly derived from them is itself insufficiently supported or tied to the facts of this case, Ms. O'Neill's royalty rate testimony should be precluded.

## III.    MS. O'NEILL'S CORRECTIVE ADERTISING CALCULATION AND TESTIMONY SHOULD BE EXCLUDED

### A.    Ms. O'Neill's Testimony That Corrective Advertising Damages Are Warranted Is Not Based on Sufficient Facts or Data

Ms. O'Neill offers an alternative corrective advertising calculation to reflect MKE's supposed actual cost to "re-educate the market" purportedly confused by the ASAP Defendants' alleged trademark infringement.  O'Neill Report (Berman Ex. 1) ¶ 50.  But to support her $7.4-8.1 million calculation, Ms. O'Neill must first point to some evidence that the value of the MKE mark was in fact diminished, and that there is a misimpression in need of correction by advertising.  *See* ASAP SJ Brief at 16-19.  "The Second Circuit requires proof of real and precise actual consumer confusion in order to recover damages under the Lanham Act."  *W.W.W. Pharm. Co. v. Gillette Co.*, 808 F. Supp. 1013, 1020 (S.D.N.Y. 1992) (citing cases).

Such proof is notably absent from the O'Neill Report and the record in this case.  Ms. O'Neill pointed in her deposition to one disgruntled potential customer, M42 Tactical, which has already had its claims against the ASAP Defendants involving a failure to deliver MKE ammunition dismissed in a separate lawsuit.  *See Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, 2023 WL 6214909, at *12 (S.D.N.Y. Sept. 25, 2023).  However, Ms. O'Neill conceded that no corrective advertising was required to correct its misimpression, which no longer exists.  O'Neill Dep. (Berman Ex. 2) at 179:5-14, 180:24-181:10.  Instead, Ms. O'Neill pointed to the unknown people she presumed M42 Tactical told about its dealings with the ASAP Defendants:

> Q.    Right.  But let's put [Mr. Cardillo of M42 Tactical] aside because we already established that he already knows and knew pretty early on that ASAP was not the authorized distributor.

A.      Right.  Let me finish my answer.

        And everybody that he spoke to and everyone that he comes across, will have heard this story.

Q.      How do you know that, by the way?

A.      Human nature.

Q.      So you think he told everybody that ASAP is an authorized distributor of MKE?

A.      No, I think he told everybody that, you know, MKE did him wrong.  There is this terrible situation of MKE, of people masquerading as MKE. And he would have theoretically – I don't know for a fact, but he would have theoretically informed others as well.

                              *        *        *

Q.      But the bottom line is you don't know factually what Mr. Cardillo said to anybody, correct?

A.      I don't.  I am just putting myself in the place as a fellow human being.

O'Neill Dep. (Berman Ex. 2) at 189:3-19, 191:6-10.

Far from the "real and precise" evidence of actual confusion that is legally required, such testimony embodies the kind of unfounded assumptions that lead to inadmissible speculation. *See*, *e.g.*, *Zaremba v. Gen. Motors Corp*., 360 F.3d 355, 357-60 (2d Cir. 2004) (excluding expert testimony where "opinions were speculative because they were based on [his] unsupported conjecture of how the accident occurred"); *LVL XII Brands*, 209 F. Supp. 3d at 643 (excluding opinion based on unsupported assumption and conjecture as to plaintiff's target market).  Ms. O'Neill's expertise as an economist does not permit her to draw "theoretical" conclusions based on "human nature" as to what M42 Tactical communicated to the industry.

Such rank speculation is particularly egregious because Ms. O'Neill refused to consider actual evidence showing the absence of any marketplace harm.  ████████████████████

13

██████████████████████████████████████████

██████████████████ (Berman Ex. 16); the absence of any awareness of the ASAP

Defendants or their activities by MKE's U.S. sales representative charged with monitoring and

reporting on trends and developments in the U.S. ammunition market (Gonenli Dep. (Berman

Ex. 4) at 43:22-44:9, 70:12-72:3, 77:11-78:5); and the testimony of numerous witnesses as to

MKE's continuing strong reputation in the U.S. market (Keles Dep. Day 2 (Berman Ex. 6) at

114:3-116:11; Gonenli Dep. (Berman Ex. 4) at 70:5-11; Beauchamp Dep. (Berman Ex. 7) at

28:4-20).  Because Ms. O'Neill identified no instances of actual confusion requiring correction

and no evidence of harm to the value of the MKE Mark, her corrective advertising opinion is

unconnected to the facts of the case and should be precluded.

> **B.    Ms. O'Neill's Opinion That Compensable Corrective Advertising Took Place Is Not Based on Sufficient Facts or Data**

Even if corrective advertising were warranted, damages can only be awarded for

corrective advertising that took place.  *See E. Mishan & Sons, Inc. v. Novel Brands LLC*, 2020

WL 9815178, at *6 (S.D.N.Y. Feb. 13, 2020) (denying corrective advertising damages where

plaintiff offered no evidence that it had to advertise specifically to correct defendant's

misrepresentations); *see also Juicy Couture*, 2006 WL 1359955, at *2 (noting extraordinary

nature of award for prospective corrective advertising, which is limited to situations where

plaintiff lacked financial means to conduct advertising).  Ms. O'Neill's opinion here that MKE

engaged in corrective advertising must be excluded because it is based solely on what her client

told her without any independent verification.  *See, e.g.*, *EEOC v. Bloomberg L.P.*, 2010 WL

3466370, at *14 (S.D.N.Y. Aug. 31, 2010) (excluding expert opinion as based on insufficient

facts and data where expert relied solely on information provided by client).

Ms. O'Neill repeatedly insisted that she had no alternative but to accept her client's contention that the increase in MKE's marketing, sales and distribution expense in the first half of 2022 was related to corrective advertising it allegedly did because of ASAP's actions.  *See* O'Neill Dep. (Berman Ex. 2) at 184:2-9 ("[W]e were assured that all of the differential was as a result of [the ASAP] issue"), 221:20-222:21 ("I took their word for it"), 223:224-4 ("We asked them if … this differential was related to this case, and they said yes."), 229:9-19 ("I was assured that … differential is as a result of ASAP's wrongdoing."), 229:20-230:16 ("I can only go by what I have been told"), 234:16-235:7 ("[T]hey told me [increase] would be because of the corrective advertising"), 236:15-237:9 (███████████████████████████████████████ █████████████████████████████████████████); *see also id.* at 184:13-185:18 ("That's what he said" in response to expansion of presence of trade shows being only because of ASAP Defendants); 210:22-214:18 ("[T]he best people to know if this has harmed their business are the people at MKE.").

Ms. O'Neill's testimony betrays a fundamental misunderstanding of her role as an independent expert.  *See Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) ("[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply.").  By simply taking her client's explanation at face value without independently verifying its claim, she "undermine[d] the reliability of [her] analysis." *Bloomberg*, 2010 WL 3466370, at *14.

Even the most rudimentary probing of MKE's position would have revealed numerous obvious holes in its proof.  First, MKE never produced any evidence in discovery showing the alleged corrective advertising, claiming its distributors were responsible for advertising.  *See*

15

ASAP Defendants' Motion to Preclude.  Its U.S. distributor likewise testified that it was solely responsible for paying for MKE's U.S. advertising, and it was unaware of any advertising by MKE in the United States.  Quirino Dep. (Berman Ex. 5) at 49:2-16, 50:2-13.  Despite these red flags, Ms. O'Neill never asked to see the purported corrective advertising done by MKE, and thus had no knowledge of any details concerning it.  O'Neill Dep. (Berman Ex. 2) at 184:2-12, 185:19-187:25.

Second, the "Marketing, Sales & Distribution" line item upon which Ms. O'Neill relied to show increased spending concededly included expenses other than the corrective advertising MKE claims to have run.  O'Neill Dep. (Berman Ex. 2) at 221:20-25.  For that reason, Ms. O'Neill requested additional details from MKE, but MKE was "unable to provide them." O'Neill Dep. (Berman Ex. 2) at 223:24-224:25. As a result, Ms. O'Neill did not know what expenses were encompassed within the "marketing," "sales" or "distribution" components, how the spending varied among them or what percentage of expenses related specifically to advertising.  O'Neill Dep. (Berman Ex. 2) at 217:11-221:10. Relying on a generalized number that includes irrelevant components robs Ms. O'Neill's opinion of any probative value.  *See*, *e.g.*, *Raskin*, 125 F.3d at 67 (excluding report that artificially inflated average retirement age by relying on overly broad category for calculation).

Third, by accepting MKE's claim that the increased expenditures were reflected in MKE's global numbers rather than in specific U.S. data, Ms. O'Neill produced inherently unreasonable results in which the amount of money supposedly needed to correct economic harm in the U.S. market is many times greater than MKE has ever spent annually in that market.  *See* Berman Ex. 16.  Given that most of MKE's sales take place in Turkey, it stands to reason that most of the expenses reflected for "marketing, sales and distribution" are related to the Turkish

16

market.  O'Neill Dep. (Berman Ex. 2) at 227:17-23.  But there is no evidence of any activities by the ASAP Defendants involving the Turkish market.  *Id.* at 227:24-228:4. By using global expenses rather than U.S. expenses, Ms. O'Neill relied on data that is materially different from the data relevant to the facts of the case so as to artificially inflate MKE's claimed damages.  *See Raskin*, 125 F.3d at 67.

Fourth, by accepting MKE's explanation, Ms. O'Neill made no effort to account for other causes that could have resulted in increased expenses globally or in the U.S., including ████ ████████████████████████████████████ the addition of a new U.S. distributor.  O'Neill Dep. (Berman Ex. 2) at 232:11-20; Keles Dep. Day 2 (Berman Ex. 6) at 80:2-82:15.  She likewise did not seek full year 2022 numbers to confirm that the increase in the first six months was not an anomaly in the timing of expenditures.  *Id.* at 237:10-240:12. Given these failures, the O'Neill Report does not assist the factfinder by making the proposition that MKE engaged in corrective advertising more likely.  *See Raskin*, 125 F.3d at 67-68 (court properly disregarded expert report that made no attempt to account for other possible causes of disparity in retirement age).

## IV.    MS. O'NEILL'S LOST PROFITS CALCULATION AND TESTIMONY SHOULD BE EXCLUDED

Ms. O'Neill's "floor calculation" of $4.34 million in lost profits ignores the relevant record evidence in the case in favor of pure speculation and double hearsay engineered by MKE's counsel.  Biased, unreliable and untethered to the actual facts of the case, the opinion is a blatant example of improper expert testimony that should be excluded.

Ms. O'Neill's calculation rests on MKE's loss of revenue suffered when one of its customers, Bear Tactical, asked to terminate a ████████ contract.  However, there is no evidence that Bear Tactical's request or MKE's decision to grant it had any connection whatsoever to any actions of the ASAP Defendants.  MKE's 30(b)(6) witness on MKE's

damages, including any lost sales, was not even aware of who Bear Tactical was, had no knowledge as to why it had stopped purchasing ammunition from MKE and expressly denied that MKE's relationship with Bear Tactical had been adversely impacted in any way.  Keles Dep. Day 2 (Berman Ex. 6) at 59:8-9, 111:20-114:13.  Global Impact, MKE's U.S. sales representative and a signatory to MKE's contract with Bear Tactical, concluded based on its discussions with Bear Tactical that Bear Tactical had overestimated its capacity to sell in the U.S. market.  Gonenli Dep. (Berman Ex. 4) at 28:18-24, 35:14-36:25.

Ms. O'Neill conceded that she did not know whether the ASAP Defendants' activities even factored into MKE's decision to allow Bear Tactical out of its contract.  O'Neill Dep. (Berman Ex. 2) at 33:11-34:21. Nor did she make any effort to learn that information from MKE during the two hours of discussions she had with it to prepare her report.  *Id*. at 30:18-32:15, 92:3-94:20.  Instead, at the suggestion of MKE's counsel, she conducted a third-party interview with John Sharpley, a broker who does not work for either MKE or Bear Tactical, and then relied on Mr. Sharpley's purported reports of his own conversation with the principal of Bear Tactical. O'Neill Report (Berman Ex. 1) ¶ 26; O'Neill Dep. (Berman Ex. 2) at 42:21-25.  This double hearsay is inadmissible, and any conclusions based on it should be excluded.

"Although the Rules permit experts some leeway with respect to hearsay evidence, Fed. R. Evid. 703, 'a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.'" *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)).  In *Marvel*, the court excluded expert reports that were "by and large undergirded by hearsay statements" from which the experts then "speculate[d] as to the motivations and intentions of certain parties."  *Id.*  "The appropriate way

18

to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *Id.  See also Island Intellectual Prop. LLC v. Deutsche Bank AG*, 2012 WL 526722, at *6 (S.D.N.Y. Feb. 14, 2012) (where witnesses with firsthand knowledge of a topic had already testified, precluding expert from testifying "about what some people told him, that other people had told them").

Ms. O'Neill's decision to ignore sworn testimony, including from her own client, concerning what transpired with the Bear Tactical deal, and instead follow the advice of MKE's counsel to speak to someone who had nothing to do with that deal, smacks of the kind of biased approach that renders expert opinions unreliable.  *See*, *e.g.*, *Bloomberg*, 2010 WL 3466370, at *14; *Rowe Entertainment*, 2003 WL 22124991, at *3.  MKE's attempt to launder into the record through an expert tenuous and otherwise admissible hearsay evidence should be rejected under Fed. R. Evid. 703.  *See Marvel*, 726 F.3d at 136; *Island Intellectual Prop*, 2012 WL 526722, at *2; *Malletier*, 525 F. Supp. 2d at 666 (excluding expert opinion that was reliant on statement of another expert who was not produced in the action).

Ironically, even if the double hearsay statement were considered, it fails to provide the requisite causal connection to the ASAP Defendants.  Ms. O'Neill's report states only that "[b]ased upon my conversation, I noted that ASAP's pricing for MKE ammunition in the U.S. market was significantly below the purchase price that Bear Tactical purchased from MKE." O'Neill Report (Berman Ex. 1) ¶ 26.  Ms. O'Neill then goes on to conclude: "Thus, Bear Tactical had no market for its product and needed to cancel its remaining purchase order." *Id*. Ms. O'Neill's report never attributes any specific statements to Mr. Sharpley or the Bear Tactical representative identifying the ASAP Defendants, and Ms. O'Neill could not even recall at her deposition whether Mr. Sharpley ever specifically referenced the ASAP Defendants' activities to

her.  O'Neill Dep. (Berman Ex. 2) at 43:2-45:16.[1]

Finally, "there is simply too great an analytical gap between the data and the opinion

proffered" with respect to the Bear Tactical transaction.  *See Joiner*, 522 U.S. at 146.  Ms.

O'Neill's convoluted theory of causation fails to explain why the ASAP Defendants'

unconsummated offers to distributors at prices below what Bear Tactical paid for ammunition

would have any impact on Bear Tactical's ability to sell such ammunition in the separate

consumer end-user market in which it operated.  O'Neill Dep. (Berman Ex. 2) at 250:23-251:7,

252:2-6.  There is neither any record evidence nor any opinion by Ms. O'Neill suggesting that

the ASAP Defendants' actions had any impact on the end user market for ammunition.  O'Neill

Dep. (Berman Ex. 2) at 252:25-253:6. Because Bear Tactical's ability to earn a profit ultimately

turned on the pricing of the end user ammunition market, there is no support for Ms. O'Neill's

speculative suggestion that the ASAP Defendants may somehow be blamed for Bear Tactical's

failure and unwillingness to perform the contract it signed.

## CONCLUSION

For the foregoing reasons, the Court should strike the O'Neill Report and any related

testimony about that Report.

Dated:  New York, New York
        January 12, 2024

                                    COWAN, LIEBOWITZ & LATMAN, P.C
                                    *Counsel for the ASAP Defendants*

                                    By:/s/Richard S. Mandel
                                         Richard S. Mandel (rsm@cll.com)
                                         Jeremy A. Berman (jab@cll.com)
                                    114 West 47th Street
                                    New York, New York 10036
                                    (212) 790-9200

---

[1] Ms. O'Neill later tried to interpret her report as somehow inferring that Mr. Sharpley had referenced the ASAP Defendants, while conceding the sentence she pointed to was "not a very well-written sentence."  O'Neill Dep. (Mandel Ex. 2) at 89:18-92:2.